Filed 10/11/24  P. v. Fisher CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> FRANK LEE FISHER, JR., <br><br>     Defendant and Appellant. | B330240 <br><br> (Los Angeles County <br> Super. Ct. No. B482961) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge.  Affirmed.

    Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

    Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Frank Lee Fisher, Jr. appeals from his conviction for first degree murder. He contends the trial court erred by (1) admitting expert testimony about factual misperceptions by gang members; (2) denying his request for a pinpoint instruction regarding prosecution witnesses' identification of people and objects in surveillance video footage; and (3) failing to adequately inquire into possible juror bias or declare a mistrial after excusing two jurors who expressed concern for their safety. We affirm.

## PROCEDURAL HISTORY

An amended information filed January 11, 2023 charged appellant with the willful, deliberate, and premeditated murder of Allen Bowen (Pen. Code, § 187, subd. (a))[1]; the attempted willful, deliberate, and premeditated murder of T.B.[2] (§§ 187, subd. (a), 664, subd. (a)); and the unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)). The amended information alleged that all three crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. (§ 186.22, subds. (b)(1)(A) [felon in possession], (b)(1)(C) [murder and attempted murder].) The amended information further alleged that appellant personally used a firearm during the commission of the murder and attempted murder (§ 12022.53, subd. (b)), and a principal personally and intentionally discharged a firearm and proximately caused great bodily injury and death to victim

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.
[2]    We refer to the surviving victim by initials to protect his privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

Bowen during both crimes. (§ 12022.53, subds. (d), (e)(1).) The amended information also alleged several aggravating circumstances enumerated in California Rules of Court, rule 4.421(a).

Appellant proceeded to jury trial on the substantive charges and firearm allegations; the court bifurcated trial of the gang enhancement and aggravating circumstance allegations. During trial, the prosecutor and defense counsel stipulated to excuse for cause two jurors who separately reported that they feared for their safety. The trial court denied defense counsel's motion for mistrial and request for a hearing to determine whether any other jurors were affected. It instructed the remaining jurors to alert the court immediately if anything affected their ability to be fair and impartial. None raised concerns.

The jury found appellant guilty of first degree murder. It was unable to reach a verdict on the remaining charges and firearm allegations. The trial court declared a mistrial on the charges and personal use firearm allegation and granted the prosecution's subsequent motion to dismiss the gang and principal use firearm allegations in the interests of justice. Appellant waived jury trial of the aggravating circumstance allegations. The court found true allegations that the "crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"; the "victim was particularly vulnerable"; and the "manner in which the crime was carried out indicates planning, sophistication, or professionalism." (Cal. Rules of Court, rule 4.421(a)(1), (a)(3), (a)(8).)

3

The trial court sentenced appellant to a term of 25 years to life. It awarded him custody credit, imposed various fines and fees, and ordered him to pay $6,408.90 in victim restitution. Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. Murder of Traveon Winkler

Traveon Winkler was a member of the Rollin' 30s Harlem Crips gang (Rollin' 30s). On August 29, 2019, Winkler was fatally shot near the corner of 75th and Flower Streets in Los Angeles, within territory claimed by a different gang, the Seven Four Hoovers (Hoovers). The person arrested for shooting Winkler was a member of the Hoovers. However, law enforcement ultimately determined, several weeks later, that the murder was not committed at the direction or for the benefit of the Hoovers. Los Angeles Police Department (LAPD) detective Patrick Howell testified that it "appeared to be a crime of opportunity" during which the perpetrator attempted to take a large sum of money from Winkler.

#### B. Perception That the Murder was Gang-Related

At the time of Winkler's murder, LAPD officer Chad Scott was assigned to the Southwest Division gang enforcement detail; his duties included monitoring the activities of the Rollin' 30s. Appellant was a member of the Rollin' 30s.

A few hours after Winkler's murder, Scott went to Martin Luther King, Jr. Park (MLK Park), a Rollin' 30s stronghold. He encountered "a large number of Rollin' 30s[,] more than a normal given day." Scott testified that the Rollin' 30s in MLK Park were aware that Winkler had been killed in the LAPD's 77th Division, which included Hoover territory. Several young Rollin' 30s

4

members "kept throwing around the term 'Snoover,'" which Scott testified was a derogatory term for members of the Hoovers gang. Scott concluded from their remarks that "Snoover did this" and "fuck Snoovers" that "they thought that a Hoover was the one that was involved in Traveon Winkler's shooting."[3]

Although the Hoovers and Rollin' 30s did not share territorial boundaries, Scott testified they were rivals because the Hoovers did not align with either the Crips or the Bloods and considered themselves "everybody killers." LAPD officer Michael Barragan, who spent five years assigned to the gang enforcement detail monitoring the Hoovers, also testified that the Hoovers were "everybody killers." LAPD detective Patrick Farmer testified that the Hoovers were rivals of the Rollin' 40s Harlem Crips, a gang with whom the Rollin' 30s shared a territorial border and generally aligned. Farmer opined that "because of the alliance between the Rollin' 30s and the Rollin' 40s, a Rollin' 30 and a Hoover would not get along."

Scott opined that the Rollin' 30s perceived Winkler was killed by the Hoovers because he was murdered within Hoover territory. He opined that "perception" is important in the context of gangs, to the extent that "[p]erception to them is 100 percent reality," both as to the way they want to be perceived and how they perceive the actions of others. He stated that gang members "don't want to be seen as weak" and "need to be perceived and looked upon if they're going to follow through"; "they're going to stand up and defend themselves and not be seen as weak." Scott

---

[3] On cross-examination, Scott conceded that he did not document hearing these statements about Snoovers, and he was unaware of other evidence such as social media posts or text messages blaming the Hoovers for Winkler's death.

testified, "[i]f it is perceived that they were disrespected by others, then they have to act as if they were disrespected."

Scott further testified that perception of external events was also important in gang culture. If a gang member is a victim of a crime, the location of the crime "will go back to the perception of who is the potential suspect in that crime." He opined that if a gang member is the victim of a crime while they are within a rival territory, other gang members are "going to perceive that that is due to the fact that they were in rival territory," and the "rival gang is responsible for that crime."

Scott testified that gang members "do their own investigation to determine who committed the crime," but they lack the ability and resources to investigate to the extent law enforcement does, such as by interviewing witnesses, obtaining surveillance video, or forensically analyzing evidence. Gangs thus act in light "of the facts that they have at that time and what makes most logical sense to them at that time given the circumstances they had that took place." They also "may perceive something incorrectly," which Scott called "misperception." Misperception could be "catastrophic in the gang culture" because "they take things from zero to a hundred so fast," and "that culture is very much eye for an eye, life for a life. If one of their own is taken, they're going to seek out retaliation of [*sic*] taking one of their own." Scott testified this could lead to "escalating a snowball of a situation of two gangs not having the right set of facts because they're not law enforcement and their perceived reality of what occurred and their sign of being disrespected . . . they're trying to show respect for the one that's passed and killed."

6

In this instance, Scott opined, the Rollin' 30s correctly perceived that Winkler was killed by a Hoover, but "were wrong in the sense that that crime was not really a gang-related crime because it was over money." He opined that appellant specifically could harbor the misperception "that simply because Winkler was killed in the Hoover territory, that he must have been killed by the Hoovers."

### C.      Memorials to Winkler

In the days following Winkler's death, two memorials were erected to commemorate him. One memorial, which featured candles and Rollin' 30s slang, was located in MLK Park. Scott testified that memorials "always" were set up in gangs' "safe zone[s]" so "members can show up to that location and . . . show respect for their recently deceased person." He continued, "there will be a larger presence at that location than typically normal. They will be dressed down in their gang clothing much more than they normally do, really showing their support for that gang." Scott additionally testified "there's a lot of drinking, a lot of alcohol, a lot of heightened emotions, whether it be bits of anger then quickly followed by bits of extreme sadness. There's a lot of remorsing [sic], talking about how they knew the person."

A second memorial was set up in Hoover territory, near the location where Winkler was killed. Scott did not know who erected the memorial. He testified that a memorial to a deceased gang member located within the territory of a different gang was a sign of disrespect to the gang that controlled the territory. Video clips retrieved from appellant's cell phone depicted the memorial near the site of Winkler's murder.

Text messages dated August 31, 2019 retrieved from appellant's cell phone referred to the Winkler memorial in MLK

7

Park, which was also depicted in video clips retrieved from the phone. On September 2, 2019, another Rollin' 30s member texted appellant that the "Stains," a derogatory term for Rollin' 30s rivals the Black P Stones, had "kicked over the candles" at the MLK Park memorial, and "[t]his shit got the hood looking weak." Scott testified that "hood" referred to the Rollin' 30s, and their concern about looking weak related to respect they received from other gangs and the community. Subsequent texts from appellant expressed dissatisfaction with how younger members of the gang had been responding to such events, including, "[b]ut even if they go, the[y] not going to do it, right? Gone be complaining."

### D. Murder of Bowen and Attempted Murder of T.B.

LAPD detective Scott Farmer testified about surveillance video footage taken on September 3, 2019 that was introduced into evidence. Video from MLK Park showed Rollin' 30s gang member Kevin Green arriving in a Jeep Compass Trailhawk around 5:14 p.m. on September 3, 2019. The white Jeep had several distinctive features, including a black roof, black stripes on the hood, and black trim around the wheel arches. Appellant arrived at MLK Park around 5:38 p.m. in a "red-colored" Chrysler Aspen SUV. He was wearing a white shirt, black sweatpants with a white mark on the left leg, and black shoes with large white lettering on the sides. Surveillance video showed appellant walking toward the area of the Winkler memorial.

Surveillance video showed appellant and Green walking to the Jeep around 9:29 p.m. Appellant got into the driver's seat and Green walked around to the passenger side. Appellant was still wearing the white shirt. Another person, whom Farmer

8

identified as Rollin' 30s member Lydell Herd, got into the front passenger seat, got out and walked away, and then came back a few minutes later. Footage from earlier in the evening showed Herd was wearing a "dark-colored t-shirt with an 'A' on it," gray sweatpants, and black and white shoes. When he got in the Jeep, however, he was wearing a black hooded sweatshirt over "the same gray sweatpants and the black-and-white tennis shoes." Based on his review of the footage, Farmer did not believe Green or anyone else was in the Jeep with appellant and Herd. Farmer testified that surveillance video showed Green leaving MLK Park around 10:55 p.m. in the Chrysler Aspen in which appellant had arrived.

The Jeep left MLK Park around 9:35 p.m., making a right turn onto eastbound 39th Street. Video clips from numerous surveillance cameras and LAPD "pole cameras" showed what Farmer testified was the same, distinctive Jeep driving from the area of Slauson and Hoover to a liquor store at 76th Street and Figueroa, about one and a half blocks from where Winkler was killed.

Surveillance video from the liquor store showed victims Bowen and T.B. walking across 76th Street at Figueroa around 10:29 p.m. The video also showed a white SUV with a dark roof and black trim around the wheel arches driving southbound on Figueroa. The SUV turned right, onto westbound 76th Street, and Bowen and T.B. entered the liquor store. An SUV with similar features drove east on 76th Street shortly thereafter. Farmer testified the SUV's new direction of travel was "consistent with the path of travel that Mr. Bowen and [T.B.] walked as they were walking into the liquor store."

At 10:32 p.m., Bowen was standing outside the liquor store, apparently waiting for T.B., who was still inside. At 10:33 p.m., two people wearing hooded sweatshirts approached the liquor store on foot. One of them was wearing dark-colored pants with a Nike swoosh on the left leg and shoes with the word "AIR" spelled out on the side. After T.B. exited the store, Farmer testified, the person in the AIR shoes "appears to have produced some sort of firearm" and pointed it at T.B. The other person in a hooded sweatshirt, who was wearing gray sweatpants and shoes with a white toe cap, was also holding a gun. At approximately 10:34 p.m., a "muzzle flash" came from the latter person's gun, and Bowen "collapsed backwards onto the sidewalk." T.B. went back inside the liquor store, and the two individuals in the hooded sweatshirts fled eastbound on 76th Street. T.B. emerged from the liquor store at approximately 10:36 p.m. and walked southbound on Figueroa.

At trial, T.B. initially denied being at the liquor store or knowing Bowen, but eventually admitted he was depicted on the liquor store surveillance video and was scared at that time. He testified that he did not remember if anything happened at the liquor store on September 3, 2019. Barragan testified that T.B. was a member of the Hoovers.

Jaela Alvarez, whose boyfriend was a friend of T.B.'s, testified that she lived a block away from the liquor store. On the night of September 3, 2019, T.B. banged on her door frantically. He was crying and threw himself on the floor. Alvarez testified that T.B. told her "they killed him." T.B. also told her that he (T.B.) said "this is Hoover Street" when he came out of the store, and "then, after that, the people started shooting, and he just ran to my house." On cross-examination, Alvarez said that T.B. told

10

her "some 'n' words from Harlem shot and killed" Bowen. She admitted she had not said anything about Harlem at the preliminary hearing, but said she mentioned it to detectives the day after the shooting.

### E. Investigation

LAPD officers responded to a call about a shooting at the liquor store. Bowen was lying on the ground, unresponsive and apparently dead. A small folding box cutter was next to him, as were expended cartridge casings.

A deputy medical examiner opined that Bowen died of multiple gunshot wounds. One gunshot entered Bowen's shoulder, traveled through his lung, and lodged in his spine. Another entered through his back and "passe[d] through mostly soft tissue." A third struck his forearm. The deputy medical examiner opined that the manner of death was homicide. On cross-examination, he testified that a toxicology screening revealed marijuana metabolites, methamphetamine, and amphetamine in Bowen's blood.

The officers who responded to the scene immediately canvassed the area for surveillance video. They ultimately collected approximately 50 hours of video from a broader area, as discussed above. Detective Farmer noticed the SUV in the liquor store video, used Google to determine the make and model, and used data from a license plate reader to determine that the SUV was a rental car. He also noted that a similar SUV appeared in several of the surveillance videos. Farmer visited the rental car lot and photographed the SUV, a "predominantly white" Jeep with "a large black stripe on the hood," a black roof, and black trim around the wheel arches.

Detective Farmer testified that he spoke to Alvarez immediately after the shooting and again the following day. During the latter interview, she told Farmer that T.B. "told her that Allen Bowen had told him that the people who shot Mr. Bowen had banged Harlem on them prior to the shooting."[4]

On the morning of October 24, 2019, the LAPD executed a search warrant at appellant's apartment; appellant was not present. Police were looking for Nike sweatpants and AIR shoes, both of which they found in appellant's bedroom. Farmer testified that the recovered sweatpants and shoes were "consistent with the pants and shoes seen on the surveillance video at King Park that Mr. Fisher is wearing" and with those worn by one of the individuals who was at the liquor store on September 3, 2019. The LAPD also executed a search warrant at Herd's home on October 24, 2019. They recovered a t-shirt with an "A" on it from a bag inside Herd's cousin's car.

Police arrested appellant on November 26, 2019. They seized his cellphone and extracted the text messages, photos, and videos described above. Additional photos showed appellant with Kevin Green, and one showed him wearing black pants with a Nike logo on the left leg. Photos extracted from Herd's phone showed Herd wearing shoes similar to those worn by the suspect who shot Bowen at the liquor store.

## II. Defense Evidence

Appellant's half-brother Patrick Bowden testified that appellant was at the laundromat when the search warrant was

---

[4] At the request of the defense, the court instructed the jury that it could only consider the suspects' alleged statements for the limited purposes of evaluating the suspects' state of mind, motive and intent, and identity.

executed at the family's apartment. One of appellant's family members owned a red Chrysler Aspen.

A gang expert, Martin Flores, testified that he had interviewed thousands of gang members and analyzed their social media and phone calls. He was familiar with both the Rollin' 30s and Hoover gangs. Flores testified that "there's been no documentation to show that they are actual rivals," and, similarly, no social media indicating a rivalry. Flores also testified that he disagreed that the Rollin' 30s' alliance with the Rollin' 40s would lead them to view the Hoovers as rivals. Flores opined that the Winkler memorial within Hoover territory would not be viewed as a sign of disrespect because it was a memorial and "there was no tension between the Hoovers and the Rollin' 30s." He further opined that, in the absence of an ongoing conflict between two gangs, "the mere fact that a member of gang 1 is killed in the area of gang 2" would not lead gang 1 to believe gang 2 was responsible for the killing.

Forensic audio/video expert Michael Jones reviewed surveillance video from MLK Park, "numerous videos of a white car driving down the street," and video of the shooting of Bowen. Some videos of the vehicle were only five frames per second, which made them "very soft or out of focus." The video from the liquor store was in black and white, and the colors of objects and clothing appeared different in different lighting. Jones knew that a lottery sign in the video was teal, and used that as a benchmark to compare gradations of the clothing worn by the suspects in the video. Jones opined that "[b]ecause of the lighting and the video is in black-and-white, it's impossible to tell the colors of the clothing in the video."

13

Appellant also introduced documents from Nike showing how many pairs and colors of pants and shoes similar to those seized from appellant were sold around the relevant time period.

## DISCUSSION

### I. Expert Testimony on Misperception

Appellant argues that the trial court erred by admitting Scott's expert testimony about perception and misperception in the gang context. He contends the testimony was inadmissible because it was common knowledge, was not based on facts in evidence, rested on Scott's personal view of the evidence rather than his expertise, and was unduly prejudicial.

We review the trial court's decision to admit expert testimony for abuse of discretion. (*People v. Duong* (2020) 10 Cal.5th 36, 60.) Under this deferential standard, we do not disturb the court's ruling unless its exercise of discretion was arbitrary, capricious, or absurd and resulted in a miscarriage of justice. (*People v. Mataele* (2022) 13 Cal.5th 372, 414.)

#### A. Background

From the outset of the case, the prosecutor theorized that the liquor store shooting was committed in retaliation for the Winkler murder in the same area a few days earlier. Defense counsel maintained that the shooting could not be retaliatory, because the Winkler murder was not gang-related. The trial court denied an oral defense motion to dismiss the gang allegation at the preliminary hearing, a section 995 motion to dismiss the gang allegation due to insufficient evidence of who killed Winkler and how, and a nonstatutory motion to dismiss the gang allegation due to the prosecutor's failure to disclose the Winkler "murder book" showing that his murder was not gang-related.

14

The defense subsequently moved in limine to exclude all gang evidence. The defense argued that the prosecutor had no evidence that appellant mistakenly believed the Winkler murder was gang-related and was using gang evidence to fill the void, thereby "inflaming this case" and prejudicing appellant. Defense counsel requested a hearing to determine relevant preliminary facts including whether the Rollin' 30s and Hoovers were rivals and what evidence the prosecutor intended to use to show that appellant acted with a retaliatory motive. The prosecutor asserted that gang evidence was not unduly prejudicial, was "highly relevant for motive," intent, and identity, and would serve as "context evidence that allows the jury to understand not just the significance of what happened but where it happened and why it happened." He acknowledged that the Rollin' 30s and Hoovers were "not traditionally rivals," but asserted that the murder of a Rollin' 30s member in Hoover territory nevertheless was "enough to provide the motive for the Rollin' 30s, four days later, to leave a memorial while the memorial is still going on for Traveon Winkler to commit a retaliation at the almost exact same spot where Winkler's murder happened."

The trial court ordered the prosecutor to make an offer of proof "as to each foundational piece of evidence" establishing that the shooters knew of Winkler's death before the liquor store shooting and "why individuals would retaliate and shoot under this set of circumstances." After hearing the prosecutor's lengthy presentation, and argument from both parties, the trial court found that the prosecutor was "able to prove each building block . . . via admissible evidence, be it some of it is by percipient witnesses; some of it is by videotape; some of it is by photographs; some of it is by LAPD gang experts." Regarding the expert

15

testimony, the court ruled that "evidence of gang sociology and gang psychology is beyond common experience," and it was "not speculation" for a gang expert to testify that, under the circumstances of this case, "gang members whose . . . colleague was killed in rival territory [would] go and retaliate." The court noted that the jury could decide whether such testimony was credible. It further found the testimony relevant, and concluded that the probative value outweighed the prejudice to appellant. The court cautioned the prosecutor that it was "not going to allow unfettered gang evidence."

At trial, gang expert Scott testified about perception and misperception as summarized above. In his brief, appellant highlights two objections his counsel made to specific questions on the grounds of speculation and "improper opinion as to the defendant's state of mind." The court sustained both objections and granted defense counsel's motion to strike an answer Scott gave during cross-examination.[5]

**B.      Analysis**

**1.      The subject of the testimony was beyond common experience.**

Appellant first argues that "[w]hether appellant or the Rollin' 30s gang 'misperceived' the facts, or drew conclusions based on the facts known to them is not a proper matter for expert opinion by a gang expert" because it is "not beyond common experience." He contends that "drawing conclusions based on the facts one has at the time is characteristic of people in general," a point he asserts is underscored by the prosecutor's use of examples involving rival colleges "even though Officer

---

[5]      The trial court also sustained at least one objection by the prosecutor during defense counsel's cross-examination of Scott.

16

Scott was clearly neither a psychologist nor an expert in college sports."

Evidence Code section 801, subdivision (a) limits expert testimony to topics "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "In general, "'[t]he subject matter of the culture and habits of criminal street gangs . . . meets this criterion.""" (*People v. Flores* (2020) 9 Cal.5th 371, 398 (*Flores*), quoting *People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*); see also *People v. Martinez* (2003) 113 Cal.App.4th 400, 413 (*Martinez*) ["Evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony."].) Thus, "a properly qualified gang expert may testify about a wide range of issues, including a gang's territory [and] retaliation. . . ." (*People v. Williams* (2009) 170 Cal.App.4th 587, 609.) Additionally, "'[c]ase law holds there where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]'" (*Martinez, supra*, 113 Cal.App.4th at p. 413.)

Scott's opinion testimony that gang members would perceive that a rival gang was responsible for a killing that took place within that rival's territory and then act upon their perception, whether accurate or not, was outside the realm of common experience. While the general concept of drawing a conclusion based on the facts available at the time is a matter of common experience, Scott's testimony applied that concept in the context of gang culture, which is not a matter of common experience. Extraterritorial gang rivalries, retaliation, and the importance of being perceived as strong are all matters beyond common experience and were relevant to demonstrate a motive

17

for what otherwise appeared to be a random shooting. (See *People v. Huynh* (2017) 65 Cal.App.5th 969, 981 (*Huynh*) ["Evidence of the 'significance of disrespect in gang culture' [citation] and the 'concept of payback within gang culture' [citation] have been found relevant to show motive and intent in murders committed for the benefit of a gang."].) Appellant's assertions that Scott's testimony on these matters was useless to the jury and "nothing more than an expression of the expert's belief on how the case should be decided" are not persuasive. Nor is his suggestion that hypotheticals involving college rivalries were inappropriate.

Appellant cites *Huynh* for the proposition that "the habits and culture of young men who socialize widely, including with gang members, is not a matter 'beyond common experience [such] that the opinion of an expert would assist the trier of fact.'" (*Huynh*, *supra*, 65 Cal.App.5th at pp. 984-985.) The case is not on point. In *Huynh*, the "culture and habits of criminal street gang members were not relevant to defendant's motive and intent because defendant did not belong to a criminal street gang, did not have a history of violence, and did not associate with other gang members within the meaning of committing crimes with gang members." (*Id.* at p. 985.) Instead, the evidence established the defendant was associated with "Thien Dang," which "was a place or group of Vietnamese men who gathered to socialize and drink." (*Id.* at p. 982.) The concepts of a gathering place or a social group that gathers to drink and socialize are common ones; the sociology and retaliatory culture of gangs are not, and it was undisputed that both Winkler and appellant belonged to the Rollin' 30s.

18

## 2. The testimony had an evidentiary basis.

Appellant next contends that Scott's opinion testimony regarding gang misperception lacked an evidentiary basis and was merely his personal opinion. Specifically, he asserts that "there was no evidence that appellant harbored a misperception that served as his state of mind and motive to kill," and Scott had no personal knowledge of misperception by appellant or the Rollin' 30s. We reject these arguments.

Experts may rely upon information within their personal knowledge (*People v. Ramirez* (2022) 13 Cal.5th 997, 1097), but an expert opinion may not rest upon speculation, conjecture, or assumed facts lacking evidentiary support. (*Flores*, *supra*, 9 Cal.5th at p. 398.) Likewise, hypothetical questions posed to an expert "'must be rooted in facts shown by the evidence. . . .'" (*Vang*, *supra*, 52 Cal.4th at p. 1045.) However, hypotheticals need not encompass all evidence within a case, and attorneys are afforded "considerable latitude" in which facts to include when posing them. (*Id.* at p. 1046.)

Here, although there was no direct evidence of appellant's mindset, evidence in the record supported Scott's opinion that he and the Rollin' 30s blamed the Hoovers for the Winkler shooting and acted in retaliation. Scott testified that he personally witnessed several Rollin' 30s members talking about "Snoovers" in the hours following Winkler's murder. The prosecutor also introduced photos from appellant's phone of both Winkler memorials, demonstrating appellant's awareness of them, and text message exchanges involving appellant in which Rollin' 30s discussed "the hood looking weak" and expressed dissatisfaction with young members' responses to the situation. Notably, appellant texted, "even if they go, the[y] not going to do it,

19

right?," from which Scott and the jury could infer that appellant intended to take action himself. Scott also testified that he was aware of specific examples in which the Rollin' 30s retaliated against other gangs based on misperceptions and the location of the precipitating event. This evidence provided a proper basis for Scott's opinions.

Appellant contends that *People v. Memory* (2010) 182 Cal.App.4th 835, 859, which held that a court erred by admitting gang evidence to show that the defendant was disposed to act violently, "is on point." We disagree. There, the prosecutor argued that the defendant acted with the requisite intent because he belonged to a club whose members were "required to fight when challenged, to not back down, and to carry knives." (*Ibid.*) The appellate court concluded the argument was improper because "there was no evidence of such a club practice." (*Ibid.*) Here, as discussed above, the record contained evidence of past misperceptions by the Rollin' 30s and evidence regarding gang culture toward retaliation generally. It also contained evidence from which Scott and the jury reasonably could infer that appellant, a Rollin' 30s member, was aware of the location of Winkler's murder, was concerned about being perceived as weak, and believed he had to take matters into his own hands.

To the extent appellant suggests the prosecutor failed to ask proper hypothetical questions, there is no indication that his counsel objected on this basis below. The only objections appellant cites were (1) asserted on other grounds and (2) sustained. We accordingly find any such argument forfeited. (See *People v. Boyette* (2002) 29 Cal.4th 381, 450 ["[D]efendant contends this was an improper hypothetical question. He failed

20

to object to this question, however, thereby forfeiting the claim."].)

**3.      The court did not abuse its discretion by concluding the testimony was not unduly prejudicial.**

Appellant's final argument regarding Scott's testimony is that its "marginal value" was "greatly outweighed" by prejudice to appellant. He asserts that the testimony impermissibly "boosted the prosecution's case by filling gaps in the evidence," particularly because "the evidence of identity was relatively weak" and testimony from a police officer "often carries an aura of special reliability and credibility." He further suggests that the testimony gave the jury the impression that the issues of motive and identity were already decided and need not be addressed during deliberations.

The trial court has broad discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence is not unduly prejudicial merely because it is damaging to a party. Instead, evidence should be excluded as unduly prejudicial when it is likely to inflame the emotions of the jury and cause the jury to use it for an illegitimate purpose. (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Here, the evidence regarding misperception was highly relevant to the disputed issues of motive, intent, and identity. The trial court carefully weighed this relevance against the "minimal" prejudice to appellant due to his gang association, and concluded that the "probative value of the evidence substantially outweighs any prejudicial effect." Appellant has not

21

demonstrated that this was an abuse of discretion on the record before us. Appellant introduced opposing expert testimony, undermining his assertion that the jury was led to believe that Scott's testimony obviated the need for deliberation. Moreover, the trial court instructed the jury with CALCRIM No. 332, Expert Witness Testimony, which directed the jury to carefully consider the expert opinions and advised that "you are not required to accept them as true or correct."

In short, we find no error in the court's admission of Scott's testimony regarding misperception.

## II.    Denial of Pinpoint Instruction

Appellant contends the trial court erred by denying a defense request for a pinpoint instruction on prosecution witnesses' identification of people and objects in surveillance video footage. We conclude that the trial court correctly denied the instruction as argumentative and duplicative of other instructions.

### A.    Background

Surveillance video footage was a key component of the evidence introduced at trial. Much of the footage came in through detective Farmer, who identified appellant and others in the videos and pointed out the white Jeep and other objects. Defense counsel did not object to Farmer's testimony or other witnesses' testimony about the videos.[6]

Toward the end of trial, defense counsel requested the following pinpoint instruction: "In their testimony, some

---

[6]    This failure to object, which appellant concedes, precludes appellant's argument that Farmer's testimony was inadmissible because he lacked personal knowledge of appellant before viewing the videos.

prosecution witnesses have identified various people and things in the videos played in the trial.  Such testimony is just the opinions of these witnesses.  You are not bound by these opinions, and you may accept or reject them.  Remember that you are the sole judges of the facts and you should make your own determination of the identification of the people and things."

Defense counsel asserted that the video evidence was critical and "there's no harm done by focusing on the fact that the jury is to make its own independent decision of what they viewed in the videos."  The prosecutor responded that the instruction was "one-sided," and its subject matter was covered by CALCRIM Nos. 302, 315, and 332.  The trial court found the instruction was argumentative because it "asks the jury to assess one party's witnesses differently than the others"; was "inappropriate" because it "lessens the value of the evidence" by characterizing it as opinions; and "is covered by the other instructions."  The trial court denied the request for the instruction.  It instructed the jury with the CALCRIM instructions identified by the prosecutor, Nos. 302 (Evaluating Conflicting Evidence), 315 (Eyewitness Identification), and 332 (Expert Witness Testimony).

### B.    Analysis

"A defendant is entitled, upon request, to a nonargumentative instruction that pinpoints his or her theory of the case."  (*People v. Ledesma* (2006) 39 Cal.4th 641, 720.)  "'In a proper instruction, "[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case."'" ( *Ibid.*)  The trial court may refuse a requested instruction if it incorrectly states the law, is unsupported by substantial evidence, or is argumentative, duplicative, or potentially confusing.  (*People v.*

23

*Moon* (2005) 37 Cal.4th 1, 30.)  Under any standard of review,[7] we conclude the trial court properly denied the instruction as argumentative and duplicative.

An instruction that "highlight[s] specific evidence, or invite[s] the jury to draw inferences favorable to one side, [is] considered argumentative and generally should not be given." (*People v. Bell* (2019) 7 Cal.5th 70, 107 (*Bell*).)  The proposed instruction here plainly falls within that definition.  Rather than pinpointing appellant's theory of the case, which was that he was not the perpetrator, the proposed instruction focused on specific testimony by prosecution witnesses and invited the jury to discount that evidence as opinion.

Appellant contends the reference to prosecution witnesses was not argumentative, because "only prosecution witnesses made such identifications."  This contention is not persuasive; the instruction could have referred to witnesses generally without calling attention to the party who called them. Instead, it directed the jury to "examine the testimony of certain prosecution witnesses with greater skepticism," rendering it argumentative. (*Bell, supra,* 7 Cal.5th at p. 107.)  Equally unpersuasive is appellant's assertion that this instruction is not argumentative because several pattern instructions given in the case also refer to particular people or groups, including CALCRIM Nos. 315 (eyewitnesses), 332 (expert witnesses), 333 (lay witnesses), and

---

[7]     As recognized in *People v. Brugman* (2021) 62 Cal.App.5th 608, 622 fn. 3, the de novo standard of review applies to the question of whether an instruction correctly states the law, but the abuse of discretion standard of review is applicable in other situations, including where a trial court denies an instruction as duplicative.

358 (defendant).[8] CALCRIM Nos. 316, 332, and 333 use neutral language and give the jury a commonsense framework for evaluating the testimony of eyewitnesses, expert witnesses, and the opinion testimony of lay witnesses. CALCRIM No. 358, which directs the jury to decide whether the defendant made written statements before trial and consider how much weight, if any, to afford them, is a "cautionary instruction" that is in harmony with the requirement of proof beyond a reasonable doubt. (*People v. Tran* (2022) 13 Cal.5th 1169, 1200-1201.) It does not invite the jury to discount the defendant's statements or treat them differently than statements made by other witnesses.

The trial court also rejected the instruction as duplicative. This ruling was not error. CALCRIM No. 200 instructed the jurors that it was up to them alone to decide the facts of the case. CALCRIM No. 226 instructed the jurors to assess witness credibility; notified them that they could believe all, some, or none of any witness's testimony; and provided a list of factors to consider when assessing the credibility and accuracy of testimony. CALCRIM No. 315 instructed the jurors how to assess eyewitness testimony, and CALCRIM No. 332 instructed the jurors how to assess expert witness testimony. Most notably, CALCRIM No. 333 instructed the jurors that they were not required to accept the opinions of lay witnesses as true or correct. These instructions fully covered the same ground as the proposed

---

[8] Appellant also asserts that CALCRIM No. 303 refers to "particular witnesses or statements." However, CALCRIM No. 303 states only, "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." At defense counsel's request, the court gave a modified version of the instruction that referred to certain testimony by witness Jaela Alvarez.

pinpoint instruction; the court accordingly did not deny appellant the right to have the jury consider his theory. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1022.) Furthermore, when the court sustained defense counsel's objection to testimony about what the perpetrators in the video appeared to be doing, it also reminded the jury that "it's your job to decide what happened in this case and decide what the facts are." The court properly denied the pinpoint instruction as duplicative.

## III. Potential Juror Bias

Appellant argues that the trial court deprived him of due process and a fair trial by failing to inquire into possible juror bias and denying his related motion for mistrial. We find no abuse of the court's discretion.

### A. Background

On the fourth day of the prosecution's case in chief, witnesses Jaela Alvarez, Detective Farmer, and victim T.B. took the stand in the morning. After lunch, a juror we will call Juror X notified the court that they "may be having some issues with regard to remaining as a juror." The court cleared the courtroom and held a sidebar with Juror X, the prosecutor, and defense counsel. Juror X told the court they did not feel safe and, because of that, feared they would not be able to make an unbiased decision. Juror X said they had "never been around gangs before, and now these people are seeing my face." Juror X also said they felt "very uncomfortable" after hearing T.B. testify, "like I should be worried and scared, too." Both sides agreed Juror X should be excused. The trial court excused Juror X for cause and replaced Juror X with an alternate juror drawn by lot. The court told the other jurors only that "one of your colleagues on the jury has been excused."

26

The following morning, a juror we will call Juror Y sent a note requesting to speak to the court and counsel. In chambers, Juror Y stated that they had safety concerns because of T.B.'s demeanor on the stand and because some of the events in the case occurred near their family's home. When the court asked if Juror Y had discussed these concerns with other jurors, Juror Y said that what "brought this to mind for me" was Juror X "crying about are we safe" in the hallway the previous day. The court asked if Juror Y had a conversation with Juror X "about that," and Juror Y responded, "I guess yes, I gave [Juror X] some tissues."

The court gave both counsel the opportunity to question Juror Y. Defense counsel asked if Juror Y knew whether Juror X had discussed safety concerns with any other jurors. Juror Y responded, "Oh, yes. [Juror X] was crying in the hallway. So, yes, it would have been seen by multiple people." Juror Y denied discussing their own concerns with the other jurors. Juror Y also denied discussing the details of the case with the other jurors. Juror Y believed fear would impact their ability to be impartial.

Outside the presence of the jury, including Juror Y, counsel stipulated to excuse Juror Y for cause. The court accepted the stipulation, excused Juror Y for cause, and selected an alternate by lot to replace Juror Y. Before the other jurors returned to the courtroom, defense counsel moved for a mistrial, arguing that the jury was "contaminated" and "infected with a fear for their safety" due to seeing Juror X crying in the hallway. The prosecutor opposed the motion, arguing that it was speculative whether any jurors saw Juror X. He further asserted that even if they had seen something, it was speculative to conclude they could no longer be fair. He accordingly asked the court "to give a

27

generic admonition" about their promise to be fair and impartial, and "to further admonish the jury that if at any point in the future anything happens to affect that ability please let [the court] know." Defense counsel expressed concern that any jurors with similar fears could lack the "wherewithal" of Jurors X and Y to come forward. The prosecutor responded with his own concern about "encourag[ing] jurors to come up with excuses to try to get off being on the jury."

The trial court took a brief recess to consider the matter, during which it asked the prosecutor to draft a proposed curative instruction. The prosecutor prepared a "rudimentary" instruction based in part on CALCRIM Nos. 200 (Duties of Judge and Jury) and 3550 (Pre-Deliberation Instructions). Defense counsel objected that the proposed instruction was too "generic" to address the specific issue of fear and its possible effect on the jury's ability to be fair.

The court denied the defense request for mistrial. It explained that it did not believe there was sufficient evidence to declare a mistrial: "There's no evidence that other jurors actually saw it, there's no evidence, concrete evidence, that other jurors heard anything [Juror X] said other than what Juror [Y] said. There's no evidence as to how that impacted, if at all, it impacted anybody in any way." The court further stated that it had told the jurors on multiple occasions during voir dire to alert the court "if they were having trouble being fair and impartial," and "in fact at least two jurors have acted on that thought at least." The court added that it had "no reason to believe that any other juror that felt that way at this time wouldn't come forward and tell the court that they couldn't be fair and impartial."

28

The court then stated that, "having considered everything that's gone on and listened to the evidence and heard the jurors, I don't find that there's enough to inquire as to each juror as to how they feel or what they saw or what they conclude right now." It further stated that "whether or not to conduct any such inquiries lies within sound [*sic*] discretion of the trial judge." It then explained that it was exercising that discretion "based on the totality of the circumstances as I understand them and all the arguments of counsel," and found "there is not enough information or evidence of anything that would impact the trial to conduct any further inquiry at this juncture."

Finally, the court considered the prosecutor's request for a curative instruction and defense counsel's objections and request that any instruction expressly address fear. The court explained that it did not want to "encourage jurors to think about things they're not thinking about," and concluded that the most appropriate solution would be to "read the first line of the second paragraph of CALCRIM 200," then add "if there's anything, both past and future that affects your ability to be fair and impartial, will you please let the court know immediately." When the jury returned to the courtroom, the court instructed: "As jurors in this case, you must decide what the facts are. It is up to you and all of you, and you alone, to decide what happened based only on the evidence that has been presented to you during this trial in this courtroom. If there is anything, both past and in the future, that affects your ability to be fair and impartial, please let the court know immediately, understood?" No jurors subsequently raised any concerns.

29

### B.    Analysis

#### 1.    The court did not abuse its discretion by not inquiring further.

As a general rule, the trial court must conduct a sufficient inquiry to determine relevant facts whenever it is put on notice that good cause to discharge a juror may exist. (*Bell, supra,* 7 Cal.5th at p. 120.)  "Not every incident warrants investigation, however." (*Ibid.*)  "'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.  [Citation.]  The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.  [Citations.]'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 53, quoting *People v. Ray* (1996) 13 Cal.4th 313, 343.)

Appellant contends the court abused its discretion by failing to conduct further inquiry into potential juror bias after Jurors X and Y reported their fears.  He "submits the trial court had no reasonable basis in this case to refuse to inquire into possible fear felt by the jurors," particularly since such inquiries could be conducted individually "so as not to infect the group."  We disagree.  As the court recognized, further inquiry posed the risk of calling undue attention to the excusing of Jurors X and Y and encouraging jurors to "think about things that they're not thinking about."  The Supreme Court has acknowledged this is a

valid concern. (See *People v. Navarette* (2003) 30 Cal.4th 458, 500 ["The court addressed the jurors' concerns about confidentiality without . . . calling the attention of the entire jury to the specifics of Juror Todd R.'s fears and thereby possibly spreading those fears."].) The record reflects the court's careful attention to the issue and balancing of numerous concerns. It does not indicate an abuse of discretion.

Appellant also argues the court erred by finding there was insufficient evidence from which to conclude the jury was tainted. He asserts that Juror Y's statements that the other jurors had "heard of the first juror's fear of safety" and seen that juror crying established that the jury had been "infected." Again, we disagree. Even if Juror Y's assertion that other jurors had seen Juror X crying proved to be true, nothing in the record suggested that event affected their ability to be fair and impartial. A juror's fear alone does not establish bias or other grounds for discharge. (*People v. Manibusan, supra*, 58 Cal.4th at p. 56.) Even where "[a]ll 12 jurors expressed concern that defendant's gang would retaliate against them as a result of the verdict," the Supreme Court found that the trial court did not abuse its discretion by failing to conduct an investigatory hearing because there was no indication the fear affected the jury's deliberations. (*People v. Brown* (2003) 31 Cal.4th 518, 581-582.) The same is true here. The court specifically asked the jurors to report if they could no longer be fair or impartial, either due to past events or in the future, and no jurors came forward. This was sufficient. (See *People v. Manibusan, supra*, 58 Cal.4th at p. 56.) The cases appellant cites do not hold otherwise.

### 2. The court did not abuse its discretion by denying the motion for mistrial.

A court should grant a motion for mistrial only when a party's chances of receiving a fair trial have been irreparably damaged. (*Bell*, *supra*, 7 Cal.5th at p. 121.) Because the determination of whether a particular incident is incurably prejudicial is inherently speculative, trial courts have broad discretion when ruling on motions for mistrial. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 634; see also *People v. Perez* (2018) 4 Cal.5th 421, 459 ["courts have 'considerable discretion' to determine whether such an error warrants granting a mistrial or whether the error can be cured through admonishment or instruction"].) We review the court's ruling for abuse of that discretion.

Appellant contends the court abused its discretion because fear is akin to "poison injected into the minds of the jurors," and the admonition the court gave was inadequate to cure the prejudice he suffered. We find no error. As the trial court observed when making its ruling, nothing in the record suggested the other jurors "wouldn't come forward and tell the court that they couldn't be fair and impartial."

Appellant's reliance on *People v. Navarette* (2010) 181 Cal.App.4th 828 is misplaced. There, a police officer willfully violated the court's order suppressing an incriminating statement made by the defendant, testifying that he did not run DNA tests "for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I can't state the first reason." (*People v. Navarette*, *supra*, 181 Cal.App.4th at p. 831.) The trial court denied the defense motion for mistrial and admonished the jury to disregard the officer's testimony. The

appellate court ruled that was an abuse of discretion, "because the instruction did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard," and "[a] jury's belief that a defendant may have confessed eviscerates the presumption of innocence." (*Id.* at p. 834.) Here, there was no similar taint to guard against. The court did not tell the jurors why Jurors X and Y were excused, and it explicitly instructed them to come forward if "anything," past or future, affected their ability to be fair and impartial. None did, even after seeing the court excuse Jurors X and Y.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, ACTING P. J.

We concur:

MORI, J.

ZUKIN, J.